# MARTIN LIPPMAN,

*vs.*

# KEHOE STENOGRAPH COMPANY.

## *New Castle, Dec.* 3, 1915.

Though General Corporation Law (22 *Del. Laws, c.* 394) § 8, provides that until directors are elected the signers of a certificate of incorporation shall have the direction of the affairs and of the organization of the corporation, etc., and though in perfecting the organization they act as incorporators, and not as stockholders, and though possibly each incorporator is entitled to the benefit of the others' help in the discharge of such duties, and may decline to act with the holder of a proxy from other incorporators, yet where three incorporators, being the only stockholders and persons interested, acquiesced in two of them acting by proxy at a meeting to organize the corporation, the meeting was valid, and could not be impeached by them or any one else.

A special meeting of the directors of a corporation was invalid where one of the directors was not present, and neither had nor waived notice prior to the meeting, though after the meeting he signed a waiver of notice and signed the minutes of the meeting, since, while presence at the meeting waives notice, and so a waiver may properly be executed before the meeting, a waiver subsequent to the meeting is ineffective.

The personal presence of each director of a corporation at a meeting of the board of directors is obligatory, and a director cannot vote by proxy, as his personal judgment is necessary, and he cannot delegate or assign or abdicate his powers.

A director of a corporation by signing a notice of a meeting of the directors did not agree that another director, although absent from the meeting, could, by subsequently assenting to the proceedings by signing the minutes, discharge his duties as a director, or be treated as making a quorum.

General Corporation Law, § 138, providing that, when any notice is required thereunder, a waiver in writing, whether before or after the time stated therein, shall be equivalent thereto, does not authorize a director to waive notice of a special meeting of the directors after the meeting, as that law does not require notice of special meetings, and the general principles of law apply.

Directors of a corporation who were stockholders before they acted as directors were qualified to act as such, though not so qualified when elected.

A meeting of the directors of a corporation of which all of the three eligible directors had notice, and which was attended by two of them, constituting a quorum, was valid, though others present were ineligible and disqualified and had not been elected as directors.

Under General Corporation Law, § 32, providing that directors may hold their meetings outside of the State if the by-laws so provide, section 3, providing that corporations shall have the powers given by their charter or certificate so far as necessary to the objects set forth therein, and section 5, par. 8, providing that the certificate of incorporation may contain any provision for the regulation of the business of the corporation not contrary to law, where the certificate of incorporation provided that directors' meetings might be held outside the State, a meeting might be so held, though there was no by-law so providing.

In the matter of the petition signed "Kehoe Stenograph Company, by H. C. Dunlap, President," praying that the answer heretofore filed in the cause, signed "Kehoe Stenograph Company, by Julius Strauss, President," be stricken from the records of said cause, and for permission to file in place thereof an answer accompanying the petition, signed "Kehoe Stenograph Company, by H. C. Dunlap, President."

The cause was heard on petition, answer, affidavits, oral testimony of witnesses produced before the Chancellor and exhibits.

*James M. Tunnell,* and with him *John J. O'Connor,* of New York City, for the petitioner.

*Saulsbury, Morris and Rodney,* and with them *A. G. McLaughlin,* of New York City, for the respondent.

THE CHANCELLOR. The purpose of the bill is to permanently enjoin the sale and transfer on the books of the company of three shares of stock of the Kehoe Stenograph Company, the ownership of which shares is claimed by the complainant as the assignee thereof from Abraham Ackerman. The stock was advertised for sale by certain persons claiming to be officers

of the company for non-payment to the company of the par value thereof. A restraining order enjoining the sale was made, but notwithstanding the order the shares were offered for sale, the seller being ignorant of the order, and in default of bidders were forfeited to the company. Thereupon a supplemental bill was filed to restrain a transfer of the shares.

An answer for the company was filed to the original bill by Strauss as president and Ackerman as secretary, under the seal of the company, and by it the allegations of the bill were admitted to be true, and a like answer was filed to the supplemental bill. Later a petition was filed purporting to be that of the company executed by H. C. Dunlap as the president thereof for leave to file an answer for the company, on the ground that he is the real president and those he represents are the real officers entitled to make a real and substantial defense to the suit.

The real question involved in the bill seeking to prevent the sale and transfer of the shares of stock is as to which faction is in control, for there are two separate organizations independently carrying on the affairs of the company. This condition is only possible because the corporation is not now transacting, and never has transacted actively, the business for which it was incorporated.

To reach the crucial points of the case its legal history must be reviewed from the beginning. The company was created under the General Corporation Law of this State by filing a certificate of incorporation dated October 6, 1913, and the subsequent recording thereof on October 9, 1913. The original subscribers to the stock and incorporators were R. Y. Slater, Abraham M. Ackerman and J. Merrick Horn.

The first question raised and discussed was whether there had been a valid organization of the company by the incorporators. The original certificate of incorporation was signed by R. Y. Slater, Ackerman and Horn, and all three subscribed for shares of stock, waived notice of the first meeting of the incorporators, and fixed a time and place for the meeting, October 9, 1913. Slater and Ackerman prior to the meeting each executed a power of attorney appointing Miss Murphey to

vote their stock at the first meeting, and specially empowering her to act for them and in their names at the meeting "in voting for directors of the said company or otherwise, and in the transaction of any other business which may come before the meeting" as fully as the principals could. At the first meeting of the incorporators and subscribers to the capital stock held on October 9, 1913, as appears on the minutes produced by each side, Slater and Ackerman were absent from the meeting, but were reported present by proxy to Miss Murphey who was present. Horn was present in person. After organizing by selecting Horn as chairman and Miss Murphey as secretary, the paper showing subscriptions to the capital stock, four shares by Slater and three each by Ackerman and Horn, aggregating the minimum amount allowed by law for organization, was approved, as likewise was the certificate of incorporation. An agent was selected to keep the office and books required by law. Authority was given to the directors to issue stock up to the amount authorized by the certificate of incorporation. The directors were also empowered to purchase property and issue full paid stock in payment therefor. Then the assignment dated October 9, 1913, whereby Horn assigned his three shares to Waples was presented and approved. An election of directors was then held and six persons were elected by ballot to hold office until their successors should be elected and qualified. The persons elected were R. Y. Slater, Ackerman, Dunlap, Biedler, Kehoe and Waples. The meeting then adjourned without transacting any other business. Afterwards there were meetings of the directors, to be considered later.

The incorporators did not adopt by-laws, or really transact any business, except to elect directors, and took no steps to secure subscriptions to stock. They did do one essential thing viz., elect certain persons to be directors, in whom, if they were eligible and duly elected, the power to adopt by-laws and elect officers was vested. Only one of the incorporators was present in person, and by transferring his shares of stock he disqualified himself from acting as director, or serving as an officer.

The question has arisen whether there has been a valid organization of the company on the ground that only one of three incorporators personally participated in the meeting, and the other two had delegated to Miss Murphey their authority to do so. I believe the practice is established that an incorporator may so act by proxy. What might the incorporators have done under the act? The names of the original subscribers to the capital stock, of whom there must be at least three, must be set out in the certificate (§ 5, *par.* 5), and each of the original subscribers, or incorporators, must sign the certificate (§ 6). Upon the making, filing and recording of the certificate and paying the tax, the persons so associated are from the date of filing constituted a body corporate (§ 7). Until directors are elected the signers of the certificate "shall have the direction of the affairs of the corporation and may take such steps as are proper to obtain the necessary subscriptions to stock and to perfect the organization of the company" (§ 8). The signers of the certificate of incorporation are both stockholders and signers, and may be the only stockholders at the time of organization. In this case they were subscribers to stock, and so were actually vested with rights as stockholders, though the stock had not been paid for. The act gives to directors the power to manage, and each must be a stockholder (§ 9). Every corporation must also have a president, secretary and treasurer, who are chosen by the directors or stockholders, as the by-laws may direct. By-laws may be made by the stockholders, and the certificate may confer the power on the directors (§ 12). Both in the original and amended certificate of incorporation of the Kehoe Stenograph Company the right to make by-laws is put in the directors. Therefore, without undertaking to direct the affairs of the infant corporation, or take steps to obtain subscriptions to stock, the only action really taken by the incorporators was to elect six persons as directors.

If the question was being considered as a new one, not affected by a well established and prevailing practice to the contrary, there is room for doubt whether a signer of the certificate can, as against the objection of any of his associate

signers, delegate his powers as an incorporator, or strip himself of the duties of the office by assignment prior to the organization meeting. Directors cannot so delegate their power to manage the affairs of the company. It is said that this rests upon the principle that an agent cannot delegate his powers. Perhaps that is a sufficient reason, for the directors are the agents of the stockholders and in some respects are trustees. But this reason is not necessarily the only one for denying the right or power of a director to act or vote by proxy, and I am inclined to think that there is a deeper reason based on the association of each director with each of the others, of which association none of the associates can divest himself while remaining a member. In other words, a director cannot authorize any one to act for him, because his associates are entitled to his judgment, experience and business ability, just as his associates cannot deprive him of his rights and powers as director.

It does not necessarily follow, however, that because a director cannot delegate his authority an incorporator as such cannot do so. Even if as a general principle an incorporator, being as such, also a manager of the affairs of the corporation with implied powers commensurate with the office and suitable to it, and with stated powers to obtain other subscriptions to the capital stock and perfect the organization of the corporation, acts not as stockholder, or subscriber to stock, but as signer of the certificate of incorporation; and although possibly each of his associates who have signed the certificate are entitled to have the benefit of his help in the discharge of the duties; and although possibly either one of them could decline to act with any other person than the associates; and even if one of the signers could by objecting prevent the other two signers from acting through a stranger authorized by a power of attorney, still the question remains if there be no such objection, and if all three associates acquiesce in the proceeding, they being the only persons then interested, and being all the subscribers to the capital stock, whether the proceedings of a meeting so held are valid as an organization meeting. It is quite clear that they would be.

Here Slater and Ackerman, by an instrument with very broad terms, purported to delegate to Miss Murphey their powers and duties as signers, or stockholders, or as subscribers to stock, and Horn, without objection to such delegation, proceeded to act with Miss Murphey in discharging the functions of the office which he held. Horn thereby waived any right he might have had, and as neither Slater nor Ackerman can object to or question the validity of the meeting, it must stand as a valid one, thereafter unimpeachable by anybody, and certainly not by either of the parties here.

The organization meeting of October 9, 1913, of the incorporators being considered valid, the next question is as to the validity of the meeting of October 29, 1913. There were before that meeting no by-laws, and there were but three stockholders, viz., Slater, Ackerman and Waples. The only action of consequence taken by the incorporators was to elect six persons to be directors. By the Act the management of the affairs of the company, including the making of by-laws and electing officers, thereafter devolved on the Board of Directors.

The Strauss faction produced minutes signed by Slater, Ackerman and Waples, purporting to be minutes of the first meeting of directors held on October 29, 1913, at 6 p. m., in Wilmington, at the registered office of the company, pursuant to an undated waiver of notice which the minutes stated had been signed by all the directors, but which were signed only by Waples, Dunlap, Slater and Ackerman. In the minutes it was also stated that Slater, Ackerman and Waples were present as a majority of the board; that Kehoe had declined to be a director; and that the resignation of Biedler was tendered and accepted. Strauss was elected a director, and then Strauss was elected president and Ackerman secretary and treasurer. By-laws were then adopted. Ackerman offered to sell certain patents to the company for four million dollars in exchange for forty thousand shares of stock, which offer was accepted.

By *ex parte* affidavits submitted it was shown that Waples was not in fact present, had no notice of the meeting, and signed the minutes and the waiver of notice after the meeting. Dunlap also signed the waiver after the meeting. It was denied that

Kehoe had refused to serve as director. It was also denied that Biedler had tendered his resignation, though a written resignation by him was in fact present at the meeting; but there was testimony that though signed by him, it had not been presented by his consent and had been purloined from his desk without his knowledge. The validity of this meeting depends on the decision of questions as to notice of it and as to waivers of notice; and this again depends on who was entitled to notice of the meeting. Assuming that only stockholders were eligible to election, and that the only stockholders on October 29, 1913, were Slater, Ackerman and Waples still there was no valid meeting unless all three were present, or at or before the meeting had had, or waived, notice of the meeting. Waples was not present, and before the meeting had had no notice of it, and did not before the meeting waive notice of it; but after the meeting did sign a waiver of notice and did sign the minutes of the meeting. For this reason alone the meeting was invalid, though it was falsely stated in the minutes that Waples was present, and though Waples signed the minutes containing the false statement.

It is, of course, fundamental that a special meeting held without due notice to all the directors is not lawful, and all acts done at such meeting are void. 10 *Cyc.* 784, 785. As to regular or stated meetings the rule is different. Presence at the meeting waives the notice; and so a waiver may properly be executed before the meeting, for there is still an opportunity to attend it. But a waiver subsequent to the meeting is ineffective.

In the case of *Holcombe v. Trenton, etc., Co.*, 80 *N. J. Eq.* 122, 130, 82 *Atl.* 618 (1912), affirmed by the Court of Appeals, 82 *N. J. Eq.* 364, 91 *Atl.* 1069, a receiver of an insolvent company took a proceeding to enforce payment of assessments on shares of stock, and the defense was based on a resolution of the Board of Directors accepting an offer to sell property for stock. The legality of the meeting was questioned. At the organization six persons were elected directors and a meeting of the directors was held on the adjournment of the stockholders' meeting. Four of the directors were present and two

absent.   In the minute book was a waiver of notice of the time and place of the meeting signed by all the six directors, and dated the day of the meeting.   It appeared, however, that the two absent directors had in fact no notice of the meeting and had signed the waiver after the meeting.   *Held*, that the proceedings were invalid, because there was no notice of the meeting given to the absent directors and because the waiver was not signed at or before the meeting was held.   Vice Chancellor Walker, afterwards made Chancellor, thus stated the reasons for his decision on this point, and his decision and the reasons therefor were afterwards approved by the Court of Appeals in a *per curiam* decision:

"The reason and principle underlying these decisions is this: Each member of a corporate body has the right of consultation with the others and has the right to be heard upon all questions considered, and it is presumed that if the absent members had been present they might have dissented and their arguments might have convinced the majority of the unwisdom of th r proposed action, and thus have produced a different result.   If, however, they had notice and failed to attend, they waived their rights; likewise if they signed a waiver of notice prior to the meeting; but consent given subsequent to the meeting, looking to the ratification of what was done, is without force to validate the action taken."

The case of *Stafford, etc., Co. v. Middle River, etc., Co.*, 80 *Conn.* 37, 66 *Atl.* 775, cited by the Strauss counsel, is not satisfactory.   The subsequent waiver might be sufficient as against the company when it acquiesced in what was done, "by making it the basis of a claim of legal right."   But the case before this court is different, and the authority of the New Jersey case is preferred. Therefore the signing by Waples of the waiver of notice of the meeting was ineffectual.   The personal presence of each director at a meeting of directors as a board is obligatory.   Discretionary powers, questions of policy, business administration, all imply the personal attendance at the meeting, so that each director may have the benefit of not only the vote, but the voice of every other director, or at least of enough other directors to constitute a quorum.   It is not a question personal to the individual directors, or whether they may approve before or after the meeting of what was done at the meeting.   A

director cannot vote by proxy, because his personal judgment is necessary, and he cannot delegate his duties, or assign his powers. Neither can he abdicate them. If not present in person to give out or receive business knowledge needed in conducting the affairs of the company he has not performed his duty, because he has not, in fact, participated in the deliberations of the board. However fully informed he may have been with everything that took place at the meeting, and every word uttered there, and though he afterwards, with this knowledge, approved of and assented to all that was there said and done, still the safe and logical principle persists that he was not validly such a participant in its deliberations and actions as to validate, by a subsequent approval thereof, the minutes of a meeting at which he was not, in fact, present in person. To hold any other view whatever other courts have held, would be opening a door to wide misunderstandings which the stricter rule avoids. Even if Waples' waiver bound him, it did not bind H. C. Dunlap, who had neither resigned, nor declined to acept an election as director, and who had not omitted any duty. True, he apparently signed an undated notice of the first meeting fixed for October 29, 1913, but he did not agree that Waples, though absent in person, could by subsequently assenting to the proceedings by signing the minutes discharge his full duties as director, or be treated as making a quorum invalid without him.

It is said that by the General Corporation Law the waiver of notice of the special meeting of October 29, 1913, was valid, though signed after the meeting, and section 138 thereof, is cited for this purpose. Section 138 is as follows:

"Section 138. Whenever any notice whatever, is required to be given under the provisions of this act, a waiver thereof in writing, signed by the person or persons entitled to said notice, whether before or after the time stated therein, shall be deemed equivalent thereto."

But, as pointed out, there is no provision of the act requiring notice of a special meeting of directors to be given, and, therefore, the general principles of law apply. For the same

reason, the signing of the minutes was ineffective. If the board consisted of the six persons named at the meeting of the incorporators, the meeting of October 29, 1913, is equally invalid for want of notice to, or a proper waiver from Dunlap, who did not resign or decline an election as director, and who did not before the meeting sign a waiver of notice. The same result would follow if Biedler had not resigned, and if Kehoe had not declined election; and both of these points are at least in doubt, with the weight of testimony largely in favor of the contention that neither had so resigned, or declined. If the number of the board was duly and legally fixed at six, then also there was not a quorum present, for two would not be a quorum of six.

But it is urged that though in the minutes and otherwise Ackerman and his followers at the meeting of October 29, treated Dunlap, Biedler and Kehoe as fellow members of the board, and accounted for their absence from the meeting, still they were not in law, members of the board, because not stockholders. Having concluded, however, that the meeting of October 29, 1913, was invalid for reasons stated above, it is not at this time important to consider the eligibility of Dunlap, Biedler and Kehoe as directors; and it is not necessary to adopt the rule for which there is considerable authority that ownership of stock need not precede election, but both election and ownership must precede action as a director, provided the qualifying shares be acquired within a time reasonable under all the circumstances.

There having been no valid meeting of the directors on October 29, 1913, was the organization meeting of the directors of January 21, 1914, regular and valid? All six of the persons chosen by the incorporators as directors had notice of the time and place of the meeting, and four of them, R. Y. Slater, Waples, Dunlap and Biedler were in attendance. Only one of them, Ackerman, who had due notice of the meeting, refused to attend and protested against the legality thereof. Of those four in attendance, two, R. Y. Slater and Waples, who were incorporators, were mentioned as present in the meeting of October 29, 1913. After reading the call of the meeting a

temporary chairman, secretary and treasurer were elected. The treasurer reported receiving subscriptions from Dunlap, Kehoe, Biedler, R. Y. Slater and Waples, five of the six persons e'ected as directors by the incorporators, for three shares of stock each, and the payment therefor. Officers were then duly elected, Dunlap, as president, Kehoe, as vice-president; G. H. West, secretary, and E. B. Warner, treasurer. The board then adopted by-laws. It repudiated as illegal, the pretended meeting of October 29, 1913, and then transacted other business. The meeting was held in Philadelphia. At this meeting every person present was qualified to act as director, all being stockholders before acting as such, though not so qualified when elected. This was the first valid meeting of the three persons, who being incorporators and subscribers, or assignee of a subscriber, were surely eligible as directors, viz., Ackerman, R. Y. Slater and Waples. All of them had due notice of the meeting and two of them, Slater and Waples, were present in person and constituted a quorum even if the other persons present, Dunlap and Biedler, were ineligible and disqualified as directors, and never had been elected as such prior to January 21, 1914. For this reason alone this meeting was valid, and the only meeting for the organization of the directors.

It is urged by the Strauss faction that the meeting of January 21, 1914, was invalid because held out of the State of Delaware, viz., in Philadelphia. By *section* 32 of the Act directors' meetings may be held outside of this State "if the by-laws so provide." This, it is said, makes it a condition precedent to the validity of the meetings of directors outside the State that they be author'zed by the by-laws, and there was no such by-law, not even among those adopted at the so-called meeting of October 29, 1913. On the other side, it is pointed out that by the certificate of incorporation (paragraph F) meetings of the directors may be held outside the State, and this provision was authorized by *section* 3, and by *section* 5, *paragraph* 8, of the Act as one chosen by the incorporators for the regulation of the corporation, and its powers, and those of its directors. But, say the other side, this charter provision was only an attempt to insure the right of the corporation to hold meetings

ings out of the State if the by-laws should so provide. The question is clearly settled by the Act, and the above mentioned provision of the charter duly included within its powers fully legalized a meeting of the directors outside the State even though there was not at the time of the meeting a by-law authorizing meetings to be so held.

Having on the facts before me reached the conclusion that the meeting of January 21, 1914, was the first validly held meeting of the directors of the company, and that it proceedings were regular, it follows, without reviewing all the subsequent meetings, or deciding the other questions raised and discussed, that the answer of what has been called the Kehoe faction should be filed in substitution for that already filed by what has been called the Strauss faction, and that the solicitors representing the former be considered as solicitors for the defendant company.

Even if on a fuller hearing in the regular way the disputed facts and the settlement of questions still undetermined should lead to different conclusions on the merits, and even if it should appear later that the conclusions now reached are erroneously decided, there would certainly be afforded a fuller opportunity to do full justice to all concerned by allowing a hostile, rather than a friendly, answer to be filed to the bill.

The prayer of the petition signed by H. C. Dunlap, as president of the Kehoe Stenograph Company, will be granted.

Note. For opinion after final hearing see *post p.* 190, which was affirmed by Supreme Court on appeal, *post p.* 412.